HARRY RUBIN & SONS, INC., Appellant, v CLAY EQUIPMENT CORPORATION, Respondent.

Third Department, December 17, 1992

APPEARANCES OF COUNSEL

*Bellcourt & Bartlett,* Cobleskill *(George R. Bartlett, III,* of counsel), for appellant.

*Hancock & Estabrook,* Syracuse *(Janet D. Callahan* of counsel), for respondent.

## OPINION OF THE COURT

HARVEY, J.

In the early 1970's, plaintiff, a retail dealer of farm equipment, entered into an oral agreement with defendant pursuant to which plaintiff was to sell and service defendant's equipment and to carry defendant's repair parts in its store. This arrangement apparently proceeded smoothly for some time until 1989, when plaintiff's president decided that the store would go out of business. At that time, plaintiff notified its suppliers, including defendant, and requested that they buy back all parts that plaintiff had in stock. Defendant refused to accept all inventory but offered to accept the return of any parts shipped within the preceding 90 days.

Unhappy with defendant's response, plaintiff commenced this action pursuant principally to General Business Law article 33-A, seeking damages in the amount of 115% of the value of the inventory, costs and counsel fees as provided by General Business Law § 696-f. In defendant's answer it asserted a counterclaim for the outstanding balance of plaintiff's

account that was still allegedly owed to defendant. Following a nonjury trial, Supreme Court found that General Business Law § 696-f did not apply and dismissed the complaint. The court also found in favor of defendant on its counterclaim. This appeal by plaintiff followed.

Initially, plaintiff contends that Supreme Court erred in concluding that General Business Law § 696-f did not apply to plaintiff's situation. We must agree. General Business Law article 33-A was enacted to "maintain harmonious relationships between those persons involved in all aspects of [the farm equipment] industry" (Mem of Sen. Kehoe, Bill Jacket, L 1988, ch 688). General Business Law § 696-f (1) provides, "*Whenever* any dealer enters into a dealer agreement with a supplier wherein the dealer agrees to maintain an inventory of equipment or repair parts and the dealer agreement is subsequently terminated, the supplier shall repurchase the inventory as provided in this article" (emphasis supplied). In construing this statute, Supreme Court concluded that because plaintiff was apparently not *required* by defendant to maintain the inventory by the oral dealer agreement, General Business Law § 696-f did not apply.

We cannot accept this reasoning. Statutory language should generally be construed according to its most natural and obvious sense whenever possible (*see,* McKinney's Cons Laws of NY, Book 1, Statutes § 94). Where the language used by the Legislature is clear and unambiguous, resort to the legislative history is inappropriate (*see,* McKinney's Cons Laws of NY, Book 1, Statutes § 120). Here, the meaning of General Business Law § 696-f (1) is readily apparent without resort to extrinsic materials. As a result, Supreme Court erred in its legal conclusion which reads into the statute a condition that was not included by the Legislature, i.e., that the supplier must "require" the dealer to maintain the inventory before the statute is triggered.

Leaving aside the question of whether plaintiff was *required* to maintain an inventory, we look next to the question of whether any agreement was made by the parties concerning the stocking of inventory. In its decision, Supreme Court found that plaintiff never agreed to maintain any inventory of defendant's equipment or repair parts. It must be remembered, however, that this Court has broad authority to review a verdict after a nonjury trial and, in an appropriate case, we may render the judgment we find warranted by the facts (*see, D. C. Leathers v Gelmart Indus.,* 125 AD2d 738, 739).

Here, our review of the relevant testimony and evidence indicates that plaintiff did agree to maintain an inventory. For example, plaintiff's president testified that plaintiff agreed to be a dealer for defendant and that, as a dealer, plaintiff would "stock parts to take care of repairs and * * * sold and installed the equipment * * * stocked parts and * * * took care of warranty work". Plaintiff's president also testified that he discussed with defendant's representative what the local market for defendant's parts was and what parts would wear and need to be replaced. He also stated that his agreement to order these parts was based upon defendant's recommendation and that plaintiff always maintain a stock of defendant's parts. This and other proof indicates the existence of an agreement pursuant to which plaintiff maintained and sold defendant's inventory. Therefore, we find that plaintiff was entitled to relief under the statute upon termination of the agreement. Upon remittal, Supreme Court should determine the appropriate amount of damages.

■ As a final matter, we agree with plaintiff that Supreme Court erred in awarding interest on defendant's counterclaim in which it alleged that plaintiff had an outstanding balance on its account with defendant in the amount of $1,418.21 when it went out of business. Supreme Court awarded pre-judgment interest on that amount at the alleged contract rate of 18% per annum, from February 1, 1989 to October 31, 1991. Nevertheless, the only proof on the record remotely support-ing the proposition that plaintiff agreed to pay any interest on its account with defendant is the fact that plaintiff accepted parts accompanied by invoices which included as a term a "service charge at the rate of 1-1½% per month * * * charged on all past due accounts". Although acceptance of goods may create a contract upon terms specified in any accompanying document *(see,* UCC 2-204, 2-206), proof such as that submitted in this case has been held to be inadequate to establish a claim for prejudgment interest at a contract rate *(see, Levy, King & White Adv. v Gallery of Homes,* 177 AD2d 967, 968). Accordingly, we find that the award should be reduced to reflect prejudgment interest at the statutory rate of 9% *(see,* CPLR 5001 [a]; 5004; *Levy, King & White Adv. v Gallery of Homes, supra).*

LEVINE, J. (concurring in part and dissenting in part). I disagree with so much of the majority's decision that reverses the dismissal of plaintiff's first cause of action in the amended

complaint and grants judgment thereon. The statutory provision upon which that cause of action is based unequivocally requires that, before a supplier is obliged to repurchase a dealer's inventory upon termination of the dealership, a prior dealer agreement must have been entered into "wherein the dealer *agrees to maintain* an inventory of equipment or repair parts" (General Business Law § 696-f [1] [emphasis supplied]). To my mind, the statutory language is clear and unambiguous in imposing the statutory obligation to repurchase inventory only when there was a binding commitment in the dealer agreement requiring the dealer to "maintain" some kind of inventory, as Supreme Court properly held.

Any possible doubts as to the foregoing meaning of General Business Law § 696-f (1) should be completely dispelled by its legislative history. It was proposed in response to "many complaints received from dealers of farm equipment claiming unfair treatment in their relationship with the manufacturers" (letter from Sen. Kehoe, Bill Jacket, L 1988, ch 688). According to the Senate sponsor, the objective of the legislation was "to provide for the contents of *franchise agreements* regarding the sale of [farm] equipment" (mem of Sen. Kehoe, Bill Jacket, L 1988, ch 688 [emphasis supplied]). The trade association representing the dealers in farm equipment throughout the State (presumably including plaintiff) wrote an extensive "Statement of Need" in promoting this legislation. Its memorandum states:

"More often than not, a dealer agreement *requires a dealer to stock a certain dollar amount of repair parts and whole-goods,* commensurate with what the supplier believes to be necessary for the dealer to properly sell and service the equipment * * *

"If the dealer is to be expected to stock the inventory of machinery and parts *the supplier stipulates to be necessary for opening a dealership,* the supplier should be required to repurchase inventory at the time of termination as prescribed for in this legislation." (Bill Jacket, L 1988, ch 688 [emphasis supplied].)

The foregoing clearly demonstrates that the legislation was designed to protect farm equipment dealers from certain abuses by farm equipment manufacturers and suppliers, among which was requiring dealers to agree to maintain a certain level of inventory as a condition for granting a franchise dealership in the manufacturers' farm equipment and parts.

There is not a shred of evidence in the record that plaintiff was required to maintain any particular inventory as a condition for being permitted to act as an authorized dealer in defendant's products. Indeed, plaintiff's president conceded that he was never required to place "stocking orders" by defendant and that, for the last nine years that plaintiff's business was in operation, defendant's representative never checked his inventory and never told him what specific parts to stock:

"When he became my territory manager, he knew that I was a good dealer and that I took care of business and he didn't really have to go over and do that, because he knew what the situation was.

"Q. He knew that you had expertise in the field, correct?

"A. That's right.

"Q. And he knew that you were capable of deciding what you needed to service your customers; is that right?

"A. That's correct * * *

"Q. And you were able to rely on your business expertise to know how to take care of your customers; is that correct?

"A. That's correct.

"Q. And you knew what you needed in order to keep those customers happy; is that correct?

"A. Yes."

Plaintiff's president further conceded that, except for questions he might have on the prospective need for replacement of parts on newly introduced products of defendant, there were no discussions with defendant's sales representatives regarding plaintiff's inventory needs of defendant's products or parts:

"Q. And it wasn't necessary for you to rely on any suggestions from the Clay people, with the single exception of using their expertise to familiarize you with a new piece of equipment; is that correct?

"A. We would go sit down and look at a piece of equipment and then decide what we needed to stock.

"Q. A new piece, correct?

"A. Right. When Clay introduced a new piece of equipment, we would sit down and go over what we needed to stock, to keep the customer happy.

"Q. And then you would make the decision based on infor-

mation received from Mr. Woods about what parts likely needed to be replaced; is that correct?

"A. That's correct."

Thus, the evidence upon which the majority relies to invoke the application of the statutory mandate for repurchasing inventory proves nothing more than a vague understanding that plaintiff would have some of defendant's products and parts on hand to sell to customers, the quantity of which was completely within plaintiff's discretion; also, that on some few occasions plaintiff would have a totally noncoercive discussion of its inventory needs regarding a new product with a customer representative of defendant, following which plaintiff would "agree" to add to its inventory of parts for defendant's new product by doing nothing more than placing a specific order.

In my view, the majority's application of the statute based upon the foregoing facts transforms General Business Law § 696-f (1) from a remedial enactment to protect farm equipment dealers from manufacturers' and suppliers' abuses in mandating inventory levels in franchise agreements, into a provision making farm equipment manufacturers and suppliers general guarantors against their dealers' financial losses on unsold inventory. Indeed, I cannot conceive of any dealership arrangement which, under the majority's construction of the statute, would not give rise to an obligation to purchase inventory upon termination of the dealership. This enlarges the rights and remedies of farm equipment and parts dealers far beyond what was intended by this legislation. I would, therefore, affirm so much of the judgment as dismissed plaintiff's first cause of action in the amended complaint.

MIKOLL, J. P., MAHONEY and CASEY, JJ., concur with HARVEY, J.; LEVINE, J., concurs in part and dissents in part in a separate opinion.

Ordered that the judgment is modified, on the law and the facts, with costs to plaintiff, by reversing so much thereof as dismissed plaintiff's first cause of action in the amended complaint and awarded defendant interest on its counterclaim in the sum of $688.80; judgment is directed in favor of plaintiff on said cause of action and matter remitted to the Supreme Court for further proceedings not inconsistent with this court's decision; and, as so modified, affirmed.